THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| *Plaintiff*, | ) ) | No. 21 C 5552 |
| v. | ) ) | Judge Virginia M. Kendall |
| AMERICAN FLANGE and GREIF, INC., | ) ) ) | |
| *Defendants*. | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

On January 7, 2022, The Equal Employment Opportunity Commission ("EEOC") filed a First Amended Complaint ("FAC") against Defendants American Flange and Greif, Inc. (together, "Defendants"). (Dkt. 19). The EEOC claims that Defendants violated the Americans with Disabilities Act ("ADA") by refusing to provide a reasonable accommodation to a former employee, Marquez Griffin, and by ultimately terminating Griffin's employment. (*Id*. ¶ 21). Now before the Court is American Flange's Motion for Summary Judgment [149] and Greif's Motion for Summary Judgment [146]. For the following reasons, American Flange's Motion [149] is denied and Greif's Motion [146] is granted.

## BACKGROUND

### I. American Flange and Greif

American Flange operates a manufacturing plant which produces plastic lids. (Dkt. 156 ¶¶ 1–2, 42–43). In 2001, Greif, Inc. acquired American Flange and since then the companies have shared human resources and accounting functions. (Dkt. 159 ¶ 11; Dkt. 161 at 11).

The manufacturing operation inside the American Flange plant involves regular forklift traffic, employees using heavy machinery to move raw materials throughout the facility, storage

of materials at heights, the use of ladders and cutting torches, and employees working in close proximity to heavy automated equipment. (*Id.* ¶ 74). The plant is not fully temperature controlled and does not have an air conditioning system. (*Id.* ¶ 4).

American Flange uses a "temp to hire" system wherein new employees are hired into short-term, temporary positions with some being offered full-time employment upon successful completion of their 90-day probationary period. (*Id.* ¶¶ 7, 11). American Flange maintains a no-fault attendance policy under which an employee who is absent from a scheduled shift receives a whole attendance point, while employees who arrive less than two hours late or depart less than two hours early from a shift receive a half point. (*Id.* ¶¶ 8–9). The attendance policy for temporary employees provides that individuals who accrue three attendance points within their probationary period will be terminated. (Dkt. 164 ¶ 7).

## II. Griffin's Disability and Employment at American Flange

Marques Griffin was diagnosed with complex partial seizures after sustaining a head injury in 2012. (Dkt. 156 ¶ 15). His condition is aggravated by various factors, including prolonged exposure to extreme cold or heat. (Dkt. 164 ¶ 19). When suffering from a seizure, Griffin typically stares off into space, is unresponsive, and both his fists adopt a clawing posture; sometimes he falls to the ground and is totally incapacitated. (*Id.* ¶¶ 16–17). These episodes are typically preceded by warning signals—a headache and pulsating sensation in Griffin's temples—but the warning may come mere seconds before a seizure. (Dkt. 156 ¶¶ 21–23). Dr. Asconape, Griffin's neurologist, recommended that Griffin stop whatever he is doing and go rest if he ever experiences the warning signs of a seizure. (Dkt. 164 ¶ 21).

In September 2019, Elite Staffing Agency ("Elite"), a temporary staffing agency that assigns its employees to work in various roles at a variety of customer locations, hired Griffin.

(Dkt 156 ¶ 36). Later that month, Elite assigned Griffin to work at American Flange as a material handler. (*Id.* ¶ 38). As a material handler, Griffin was responsible for working inside the plant, operating a butane torch to remove excess plastic from lids. (*Id.* ¶¶ 6, 44–45). Griffin attended his first shift at American Flange on September 20, 2019 without incident. (*Id.* ¶ 38). At the end of his second shift, Griffin accidentally clocked out 30 minutes early. (*Id.* ¶ 47). Despite communicating his mistake to his supervisor, Thomas Dyer, and going back to finish his shift, Griffin received .5 attendance points. (*Id.*; Dkt. 164 ¶ 35).

Griffin worked the next three shifts without accruing any additional points. (Dkt. 156 ¶ 48). On September 30, 2019, hours before the start of his sixth shift, Griffin informed Dyer via text that he would not be at work that day due to "a medical situation." (*Id.* ¶ 49). During his next shift, Griffin provided Dyer with a note signed by Dr. Asconape, stating: "[Mr. Griffin] has been diagnosed with complex partial seizures. Mr. Griffin described an event that occurred today that required him to stay home from work.[] Please consider today's absence an excused. Please contact the office if further information is required." (Dkt. 156 ¶ 52; Dkt. 152-2). Nevertheless, Griffin was assessed one attendance point for his absence. (Dkt. 156 ¶ 55).

Griffin continued to work without accruing any additional points until October 9, 2019, when he once again called off from work. (Dkt. 156 ¶ 56). When informing Dyer of his anticipated absence, Griffin did not mention that the absence was medically related. (*Id.* ¶ 57–58). The following day, Dyer elected to terminate Griffin's assignment. (*Id.* ¶ 65). Idaena Marquez, the recruiter for Elite who placed Griffin at American Flange, called Griffin to inform him that his assignment had been terminated. (*Id.* ¶¶ 68–69). During this call, Griffin informed Marquez that his October 9 absence was caused by a disability-related headache. (*Id.* ¶ 70; Dkt. 164 ¶ 40).

Marquez then emailed American Flange's Human Resources Coordinator, Maria Ortega, asking that Griffin's termination be nullified. (Dkt. 164 ¶ 40). Marquez's request went unanswered.

### III. Procedural History

On February 10, 2020, Marques Griffin filed a charge with the EEOC, alleging disability discrimination. (Dkt. 76 ¶ 1; Dkt. 65-1 at 4). In a February 12, 2021 letter of determination, the EEOC informed American Flange and Greif that the EEOC had reasonable cause to believe that both employers had violated the ADA by "disciplining [Griffin], denying him a reasonable accommodation, and discharging him" based on his disability. (Dkt. 76 ¶ 3; Dkt. 65-1 at 6). On October 19, 2021, after conciliation efforts failed, the EEOC sued American Flange and Greif. (Dkt. 1). Later, the EEOC amended its complaint. (Dkt. 19). Now, American Flange and Greif move for summary judgment on the EEOC's claims. (Dkts. 146, 149).

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Med. Protective Co. of Fort Wayne v. Am. Int'l Specialty Lines Ins. Co.*, 990 F.3d 1003, 1008 (7th Cir. 2021). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). "A genuine issue of material fact exists only if 'there is sufficient evidence'" for a jury to return a verdict for the nonmoving party. *BirchRea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "Speculation is not sufficient to survive summary judgment; there must be evidence." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) (cleaned up and internal citations omitted).

4

**DISCUSSION**

I. **American Flange's Motion for Summary Judgment**

The EEOC brings a failure to accommodate claim and a disability-based discrimination claim against American Flange and Greif. The Court first considers these claims with respect to American Flange.

    A. **The EEOC's Failure to Accommodate Claim Survives.**

To prevail on a failure to accommodate claim, a plaintiff must prove that (1) he is a qualified individual with a disability; (2) his employer was aware of his disability; and (3) the employer failed to reasonably accommodate his disability. *Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019). Relevant to—and sometimes determinative of—the third element is the employer and employee's respective cooperation "in an interactive process to determine a reasonable accommodation." *Id.* at 979. If a "reasonable accommodation was possible and the employer did not offer it … responsibility will lie with the party that caused the breakdown." *Id.* There is a genuine dispute of material fact with respect to each element of the failure to accommodate claim. Thus, American Flange's motion for summary judgment on this claim is denied.

        1. **There is a genuine dispute about whether Griffin is a qualified individual with a disability.**

Under the ADA, a "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of [their job]." 42 U.S.C. § 12111(8). A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, … and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). "An

5

individual is not qualified to perform their job if they present a 'direct threat' to their own health and safety or that of others." *Darnell v. Thermafiber, Inc*., 417 F.3d 657, 660 (7th Cir. 2005).

Whether an individual is a "qualified individual with a disability" is a two-part inquiry. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). First, courts consider "whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, license, etc." *Id.* (internal quotations and citations omitted). Second, if the individual does satisfy the position's prerequisites, courts "consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* (internal quotations and citations omitted). Whether an individual is a qualified individual with a disability is determined as of the time of the employment decision. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005). There is no dispute that Griffin satisfied the first inquiry, so the Court turns its attention to the second inquiry: whether Griffin was able to perform the essential functions of the material handler position—namely regular and consistent attendance and working in an environment without temperature regulation—with or without reasonable accommodation, as of September 2019.

### a) Attendance

Generally, an employer is permitted to treat regular attendance as an essential job function and need not accommodate erratic or unreliable attendance. *EEOC v. Yellow Freight System, Inc*., 253 F.3d 943, 948–49 (7th Cir. 2001). A plaintiff whose disability prevents him from coming to work regularly cannot perform the essential functions of his job, and thus cannot be a qualified individual for ADA purposes. *Basden v. Pro. Transp., Inc*., 714 F.3d 1034, 1037 (7th Cir. 2013) (citing *Waggoner v. Olin Corp*., 169 F.3d 481, 484–85 (7th Cir.1999)). An employee's ability to

come to work, or to otherwise perform the essential functions of his job, is examined as of the time of the adverse employment decision at issue. *Id.* (citing *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 818 (7th Cir. 2004)). In response to an employer's motion for summary judgment, it is the plaintiff's burden to produce evidence sufficient to permit a jury to conclude that he would have been able to perform the essential functions of his job with a reasonable accommodation. *Id.* (citing *Hammel*, 407 F.3d at 863–64).

American Flange contends that Griffin's attendance was erratic and unreliable, and as such they were not required to accommodate his absences. The EEOC does not put forward evidence of, or even suggest, an accommodation that would improve Griffin's attendance or his ability to anticipate his absences. Instead, the EEOC insists that Griffin's attendance could reasonably be considered regular and consistent. Both parties rely on the same evidence—Griffin's attendance record—in support of their position. The undisputed facts of the case are that Griffin worked at American Flange for just 20 days, during which time he was scheduled for eleven shifts. Over the course of these eleven shifts, he had two disability-related absences and both times Griffin provided Dyer with advanced notice of his absence.

While it is "true that the ADA does not protect persons who have erratic or unexplained absences from work," the Seventh Circuit has "not establish[ed] a hard-and-fast rule that no absences from work need be tolerated." *Stragapede v. City of Evanston, Illinois*, 865 F.3d 861, 866 (7th Cir. 2017), as amended (Aug. 8, 2017) (internal citations and quotations omitted). Neither side points to cases involving a similarly brief timeline of events, and the Court is not aware of any. American Flange analogizes to cases involving plaintiffs whose attendance issues were documented over the course of several months, if not years. *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478 (7th Cir. 2014) (employee exhibited excessive tardiness over five-year period); *Basden v. Professional Transp., Inc.*, 714 F.3d 1034 (7th Cir. 2013) (employee missed

7

twelve shifts over four-month period); *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 946 (7th Cir. 2001) (employee missed hundreds of shifts over five-year period). With a track record as long as those in *Taylor-Novotny*, *Basden*, and *Yellow Freight*, a court could confidently determine whether a plaintiff was capable of regular and consistent attendance. No such record exists here. While it is tempting to extrapolate from the evidence and make assumptions about what Griffin's future attendance would be like, the Court, at summary judgment, is required to look only at Griffin's ability to attend work as it was established in September and October 2019. The evidence from that time does not establish one way or the other whether Griffin was capable of regular and consistent attendance. As such whether Griffin's attendance was sufficient to render him qualified under the ADA is a question best left to a jury.

### b) Temperature

American Flange argues further that Griffin is not a qualified individual because his seizure disorder prevents him from being exposed to cold and heat for extended periods, which is an essential job requirement because the manufacturing plant is not temperature-controlled. This argument fails for reasons similar to those stated above. American Flange seeks to disqualify Griffin based on assumptions about his future performance, but whether Griffin is a qualified individual must be determined by analyzing whether he was qualified at the time of his termination. There is no evidence that Griffin's condition was aggravated by the weather during his assignment to American Flange or that his condition necessarily would have been aggravated, even with an accommodation, if he were permitted to continue working into the winter and summer months. While it is true his condition could be aggravated by particularly hot or cold temperatures, there is no evidence demonstrating that the weather did in fact impact his ability to work the plant "at the

8

time of the termination decision" such that Griffin should not be considered a qualified individual. *Hammel,* 407 F.3d at 862.

### 2. There is a genuine dispute about whether American Flange was aware of Griffin's disability and whether Griffin requested an accommodation.

Under the ADA, an employee bears the "initial duty to inform [his] employer of a disability." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005) (internal citations omitted). "This initial duty, however, requires *at most* that the employee indicate to the employer that [he] has a disability and desires an accommodation." *Id*. (emphasis added). Upon such notice, the employer and employee must work together in an "interactive process" to determine the extent of the disability and what accommodations are appropriate and available. *Id*. at 804.

Here, there is a genuine dispute about whether American Flange was even aware of Griffin's disability prior to his termination. Griffin testifies that he hand delivered a doctor's note to Dyer, informing Dyer of his condition. Meanwhile, Dyer testifies that he never received the letter and was unaware of Griffin's condition throughout Griffin's employment with American Flange. The Court does not weigh the credibility of these witnesses. It is sufficient that there is evidence upon which a reasonable jury could find that Griffin notified Dyer, and thereby American Flange, of his disability.

Further, American Flange argues that Griffin's doctor's note did not adequately communicate Griffin's desired accommodation and, at most, the letter requests retroactive relief. The EEOC insists that the note requests excused medical leave as an accommodation. On its face, the note discloses that Griffin suffers from seizures, requests that Dyer excuse Griffin's medically-related absence, and offers to discuss further if American Flange required additional information. Under facts like these, "[w]here notice is ambiguous as to the precise nature of the … desired

9

accommodation, but [] is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification. *Sears*, 417 F.3d at 804 (citing *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)). American Flange "cannot shield itself from liability … by intentionally remaining in the dark." *Id.* Accordingly, the ambiguous nature of Griffin's requested relief is not enough to defeat his failure to accommodate claim.

### 3. American Flange is not entitled to the "direct threat" defense.

Finally, American Flange attempts to assert the "direct threat" defense in support of its position that Griffin is not a qualified individual. This argument, too, is unavailing. The ADA permits employers to implement "qualification standards" "that screen out … or otherwise deny a job … to an individual with a disability" so long as the standards are "job-related and consistent with business necessity" and no reasonable accommodation would allow the individual to meet such standards. 42 U.S.C. § 12113(a). An employer's qualification standards "may include a requirement that an individual [] not pose a direct threat to the health or safety of other individuals in the workplace." § 12113(b). The existence, or nonexistence, of a threat must be determined from the standpoint of the person who took the adverse action, and the risk assessment must be based on medical or other objective evidence. *Cf Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) (citing 28 CFR § 36.208(c) (1997)).

In determining whether a company may avail itself of the direct threat defense, courts consider whether the company assessed the employee's potential threat before undertaking the adverse employment action. *See e.g., Pontinen v. United States Steel Corp.*, 26 F.4th 401, 406 (7th Cir. 2022) (direct threat existed when employer's actions were based on medial professionals' opinions); *Felix v. Wisconsin Dep't of Transportation*, 828 F.3d 560, 569 (7th Cir. 2016) (before

10

terminating plaintiff, employer required her to undergo professional assessment to determine whether she continued to pose a risk); *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 659 (7th Cir. 2005) (employer determined direct threat existed after conducting pre-employment physical); *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (employer allowed to pass over applicant who could not pass company's pre-employment physical examination). American Flange argues that it is entitled to the direct threat defense because it conducted an individualized assessment of the risk Griffin posed to the workplace in contemplation of this litigation. But the parties do not cite to any cases where an employer successfully established a direct threat defense without conducting a risk assessment before taking an adverse employment action, and the Court is not aware of any.

Indeed, the EEOC interpretive guidance notes that an "employer may require, *as a qualification standard*, that an individual not pose a direct threat to the health or safety" of himself or others. 29 C.F.R. § Pt. 1630, App. (emphasis added). Nothing in the EEOC's guidance suggests that an employer can take an adverse employment action and later justify it with objective evidence of the employee's threat level. While safety concerns are, of course, important, the EEOC interpretive guidance makes clear that a direct threat is not lightly found. To the contrary, the EEOC instructs that

> [t]he assessment that there exists a high probability of substantial harm to the individual, like the assessment that there exists a high probability of substantial harm to others, must be strictly based on valid medical analyses and/or on other objective evidence. This determination must be based on individualized factual data, using the factors discussed above, rather than on stereotypic or patronizing assumptions and must consider potential reasonable accommodations. Generalized fears about risks from the employment environment, such as exacerbation of the disability caused by stress, cannot be used by an employer to disqualify an individual with a disability. For example, a law firm could not reject an applicant with a history of disabling mental illness based on a generalized fear that the stress of trying to make partner might trigger a relapse of the individual's mental illness. Nor can generalized fears about risks to individuals with disabilities in the event of

11

an evacuation or other emergency be used by an employer to disqualify an individual with a disability.

*Id.* In other words, the "focal point" in a direct-threat analysis is "the ex ante reasonableness of a defendant's determination, not an ex post determination of its accuracy by the factfinder." *Makinen v. City of New York*, 53 F. Supp. 3d 676, 697–98 (S.D.N.Y. 2014).

Assuming, as the Court must, that American Flange did indeed receive notice of Griffin's disability, American Flange does not put forward any evidence to suggest that Dyer's decision to terminate Griffin was based on objective and individualized assessment of the risk presented by Griffin's disability. Accordingly, American Flange is not entitled to the direct threat defense.

### B. The EEOC's Discrimination Claim Survives.

The ADA generally prohibits covered employers from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To prevail on a claim for disability-based discrimination, a plaintiff must establish: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) disability was the "but for" cause of the adverse employment action. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020) (citing *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019)). Whether a plaintiff presented direct or indirect evidence is of no consequence, the "sole question that matters" is "whether a reasonable juror could conclude" based on all relevant evidence, that the plaintiff "would have kept his job" if he were not disabled, "and everything else remained the same." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764. (7th Cir. 2016).

As discussed above, there is no dispute that Griffin has a disability and there is a genuine dispute about whether he is a qualified individual. As to the third element this claim, there is a genuine dispute about whether Griffin was terminated because of his disability. American Flange conclusively states that there is no evidence of discrimination sufficient to support the EEOC's

12

claim under the direct method of proof and moves right along to its assessment of the EEOC's shortcomings under the *McDonnell-Douglas* burden shifting framework, sometimes referred to as the "indirect method" of proof. Not so fast. It bears repeating that the penultimate question is not whether the EEOC satisfies one method of proof or another, all that matters is whether a reasonable jury could conclude, based on all relevant evidence, that Griffin would have kept his job if he were not disabled. Based on the record before the Court, it seems that he would have.

Direct proof of discrimination is not limited to near admissions by an employer that its decisions were based on a proscribed criterion, but "also includes circumstantial evidence which suggests discrimination through a longer chain of inferences." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1060 n.1 (7th Cir. 2008) (internal citation and quotations omitted). Circumstantial evidence of causation may include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022) (quoting *Rowlands v. United Parcel Serv.–Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018)) (internal quotations omitted).

The EEOC relies on the first and fourth categories of circumstantial evidence to support its discrimination claim, arguing that Griffin was fired shortly after disclosing his disability to Dyer and that American Flange's reason for firing him was pretextual. American Flange contends that Dyer never received the doctor's note disclosing Griffin's disability and that Griffin was fired for a legitimate reason: his imperfect attendance. Construing the facts in favor of the EEOC, as the Court must, there is a suspicious temporal relationship between Griffin disclosing his disability

13

and his termination. While suspicious timing, without more, is insufficient to create a jury issue on the inference of discrimination suspicious timing alongside evidence of pretext is enough. *Rowlands v. United Parcel Serv.–Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018) (citing *Anderson v. Donahoe*, 699 F.3d 989, 996 (7th Cir. 2012)).

Here, there is circumstantial evidence that would allow a reasonable juror to infer that American Flange's reason for firing Griffin was pretextual. First, although the attendance policy explains that a temporary employee will be terminated after accruing three points, Griffin was terminated proactively after accruing only two points. While American Flange permits supervisors discretion to terminate employees who accrue less than three points during their probationary period, Dyer admits that he hired multiple other temporary employees into permanent positions even though they accrued more than three absences during the probationary period. The discrepancy suggests that imperfect attendance is not always determinative for Dyer. While the Court "cannot second-guess [American Flange's] employment decisions to the extent that they were innocently unwise or unfair," the EEOC "has presented sufficient evidence from which a finder of fact could genuinely call into question [American Flange's] honesty." *Rowlands*, 901 F.3d at 802 (citing *Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 200 (7th Cir. 2011)). The combination of unequal application of the attendance policy, the ambiguity about whether Griffin's first .5 absence should have been excused, and the timing of his termination provide sufficient evidence to permit a reasonable trier of fact to infer pretext and discriminatory intent. "In the end a jury might not credit [the EEOC's] evidence and could accept [American Flange's] explanations. But given the conflict on material issues, a trial is necessary." *Ortiz*, 834 F.3d at 766.

## II. Greif's Motion for Summary Judgment

Turning to the EEOC's claims against Greif, Greif insists that is not an employer as defined by the ADA and, even if it were, Greif, as a parent company, cannot be held liable for the wrongs of its subsidiary. The Court considers each argument in turn.

### A. There is dispute about whether Greif is an "employer" as defined by the ADA.

Greif first argues that it should evade liability altogether because it does not have any employees and, as such, it is not an employer as defined by the ADA. (Dkt. 147 at 3). To qualify as an "employer" under the ADA, Greif must have had "15 or more employees for each working day in each of 20 or more calendar weeks" in 2018 or 2019. 42 U.S.C. § 12111(5)(A).

Setting aside that Greif's own website boasts its "more than 16,000" employees, Greif's own representations to the Court call into question whether Greif truly has zero employees. First, Greif submits a declaration from Brian Hamilton insisting that Greif does not have any employees, nor did it have any during the relevant time period. (Dkt. 153-1 ¶ 10). Yet, Hamilton identifies as the Vice President of HR Global Operations for Greif, Inc., which suggests that Greif presently has as least one employee: Brian Hamilton. (*Id.* ¶ 1). More importantly, Greif notes that Pete Watson was the CEO and chairman of Greif, Inc. as of 2019. (Dkt. 162 ¶ 12). Accordingly, the Court cannot consider Hamilton's affidavit because it appears that the affidavit is incorrect as to the current and former number of Greif employees. Accordingly, a genuine dispute remains about whether Greif has enough employees to be considered an employer under the ADA.

### B. American Flange and Greif do not constitute a single employer.

Generally, an ADA plaintiff may not sue their employer's parent company because "parent corporations are not liable for the wrongs of their subsidiaries unless they cause the wrongful conduct (and so are directly liable)." *Bright v. Hill's PetNutrition, Inc.*, 510 F.3d 766, 771 (7th Cir.

2007). The doctrine of alter ego liability—also known as affiliate liability—expands the scope of entities properly considered one's "employer" under Title VII and, by extension, the ADA. More specifically, under the alter ego theory of liability, "an entity affiliated with the employer or former employer of a Title VII plaintiff may be named as a Title VII defendant if it has forfeited its limited liability." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 668 (7th Cir. 2013) (citing *Worth v. Tyler*, 276 F.3d 249, 260 (7th Cir. 2001); *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 941 (7th Cir. 1999)). The EEOC and Greif both correctly note, a corporate entity may forfeit its limited liability status where:

> 1) the traditional conditions for "piercing the corporate veil" are present; or 2) the corporation took actions to sever the small corporation for the express purpose of avoiding liability; or 3) the corporation directed the discriminatory act, practice, or policy of which the employee is complaining; or 4) the corporation is liable based on the misdeeds of its predecessor through successor liability.

*Wessman v. DDB Chi., Inc.*, No. 12-cv-6712, 2012 WL 6216773, at *2 (N.D. Ill. Dec. 13, 2012) (citing *Worth*, 276 F.3d at 260); *see also Alam*, 709 F.3d at 668 (explaining same) (citing *Worth*, 276 F.3d at 259–60; *Papa*, 166 F.3d at 941). Importantly, under *Papa*, once affiliate liability is established, courts may aggregate the total number of employees under control of the single employer for the purpose of determining the appropriate damages cap under the ADA. *Papa*, 166 F.3d at 941–43.

Here, the EEOC rests its affiliate liability theory on the argument that conditions for piercing the corporate veil exist. But the facts of the case, even when taken in the light most favorable to Plaintiff, reveal that the affiliate liability theory fails as a matter of law. To meet its burden, the EEOC would have to show "such unity of interest and ownership [between American Flange and Greif] that the separate personalities … no longer exist" and "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Worth*, 276 F.3d at

16

260 (quoting *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir. 1985)). In Illinois, there is sufficient unity of interest when corporations (1) fail to maintain adequate corporate records or to comply with corporate formalities, (2) commingle funds or assets, (3) undercapitalize, or (4) treat the assets of another as their own. *Macrito v. Events Exposition Services Inc.*, 2011 WL 5101712, at *4 (N.D.Ill.2011) (citing *Hystro Products, Inc. v. MNP Corp.*, 18 F.3d 1384, 1389 (7th Cir.1994)).

  The EEOC claims that American Flange and Greif commingled funds, that American Flange was undercapitalized, and that Greif treated American Flange's assets as its own; but the EEOC does not produce any evidence establishing these facts. Further, the parties do not dispute that American Flange and Greif were properly incorporated as separate entities; and the EEOC offers no evidence suggesting the companies were not maintained as such. The EEOC appears to argue that corporate formalities were defeated by American Flange and Greif sharing human resources functions (e.g., advertising for open positions and hiring) and financial functions (e.g., facilitating direct deposit payments and tracking employees' time worked). Even taken in the light most favorable to the EEOC, its evidence only establishes that American Flange and Greif were integrated. There is no evidence suggesting that the integration of these two companies was meant to "manipulate creditors and thus warrant[s] veil-piercing." *Prince v. Appleton Auto, LLC*, 978 F.3d 530, 535 (7th Cir. 2020). Because EEOC does not offer any evidence that the integration between American Flange and Greif "sanctioned a fraud or promoted injustice," it has failed to establish that the conditions of veil-piercing are present to justify imputing liability to Greif for American Flange's actions.

  As for the other situations which would support a finding of affiliate liability, and thus support aggregating employees, the EEOC fails to show that any applies here. The EEOC cannot

argue that Greif took actions to sever American Flange for the purpose of avoiding liability or that successor liability applies because Greif *acquired* American Flange. Further, the EEOC has not produced any evidence suggesting that Greif had anything to do with Griffin's termination. Indeed, the undisputed evidence demonstrates that Dyer, an American Flange employee, was solely responsible for Griffin's termination. Accordingly, the EEOC has failed to show that American Flange and Greif are a single employer or that, under *Papa*, the aggregation of American Flange and Greif employees is appropriate.

## CONCLUSION

For the reasons set forth above, American Flange's Motion [149] is denied and Greif's Motion [146] is granted.

Virginia M. Kendall
United States District Judge

Date: September 16, 2024